**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| EUGENE SCALIA, | : | |
| SECRETARY OF LABOR | : | No. 3:20-cv-00458 (VLB) |
|     Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LOCAL 933, NEW HAVEN | : | |
| FEDERATION OF TEACHERS, | : | March 18, 2021 |
|     Defendant. | : | |

**MEMORANDUM OF DECISION GRANTING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT, [ECF NO. 23], AND DENYING DEFENDANT'S
MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT, [ECF NOS. 18, 38]**

Plaintiff Eugene Scalia, Secretary of Labor ("Plaintiff") brought the instant action for violation of Title IV of the Labor-Management Reporting and Disclosure Act ("LMRDA" or "the Act"), 29 U.S.C. §§ 481-483, seeking a Court Order overturning Defendant Local 933, New Haven Federation of Teachers' ("NHFT") rerun election of February 2020 because NHFT's discipline of one of its members violated the LMRDA, and directing NHFT to conduct a new election under Plaintiff's supervision. Presently before the Court are NHFT's Motion to Dismiss, [ECF No. 18], NHFT's Motion for Summary Judgment, [ECF No. 38], and Plaintiff's Motion for Summary Judgment [ECF No. 23]. For the reasons discussed below, the Court GRANTS Plaintiff's Motion for Summary Judgment and DENIES NHFT's Motions to Dismiss and for Summary Judgment.

I.       **Material Facts**

"Plaintiff Eugene Scalia is the duly appointed Secretary of Labor, United States Department of Labor. Plaintiff is authorized to bring this action under

section 402(b) of Title IV of the LMRDA, 29 U.S.C. § 482(b)."  [ECF No. 1 (Complaint) ¶ 4].

Defendant NHFT is, and at all times relevant to this action has been, a local labor organization engaged in an industry affecting commerce within the meaning of sections 3(i) and (j) and 401(b) of the Act, 29 U.S.C. §§ 402(i)-(j); 481(b).  Plaintiff's Local Rule 56(a)(1) Statement ("Pl.'s Stmt.") ¶ 1, [ECF No. 23-16]; Defendant's Combined Local Rule 56(a) Statement (Def.'s Stmt.") ¶ 1, [ECF No. 39].  NHFT represents public school teachers working at the New Haven Public Schools and certain other employees in the New Haven area.  Declaration of Dave Cicarella dated Jan. 29, 2021 ("Cicarella Decl.") ¶ 3.  [ECF No. 38-22].

NHFT is subordinate to the American Federation of Teachers ("AFT"), a national labor organization within the meanings of sections 3(i) and 3(j) of the Act, 29 U.S.C. § 402(i)-(j).  Pl.'s Stmt. ¶ 2; Def.'s Stmt. ¶ 2.

NHFT conducted an election on December 4, 2018.  Pl.'s Stmt. ¶ 3; Def.'s Stmt. ¶ 3.  Thomas Burns, a member in good standing of NHFT, was a candidate for President in the December 4, 2018 election.  Pl.'s Stmt. ¶ 4; Def.'s Stmt. ¶ 4.  Incumbent NHFT President Dave Cicarella won the election for President with 392 votes; Thomas Burns received 372 votes, and Cameo Thorne received 122 votes.  Cicarella Decl. ¶ 6.

On January 24, 2019, Burns filed a protest of the December 4, 2018 election with NHFT.  Pl.'s Stmt. ¶ 5; Def.'s Stmt. ¶ 5; Declaration of David Strom dated June 12, 2020 ("First Strom Decl."), Exhibit A, [ECF No. 18-2 at 13-30 ("Burns Protest Letter")].  Burns asked for a re-run of the December 4, 2018 election because he

"ha[d] been involved in Union elections for over 20 years and never [had he] seen so many irregularities."  Burns Protest Letter at 13.  Specifically, he protested that:

- MK Election Services, LLC, who ran the mail-in ballot election, prematurely opened the post office box containing the mail-in ballots, which caused ballots from another election to be "mixed together" with the NHFT election ballots, thereby causing some NHFT members' votes to go uncounted, *id.* at 13;

- The NHFT newsletter was improperly used to bolster Cicarella's candidacy by placing an article about him and his picture on the front page of the November/December issue, *id.* at 14;

- NHFT funds were improperly used to buy gift cards for Cicarella supporters before and after the election, *id.*;

- Late arriving ballots were improperly counted, and eleven NHFT members requested duplicate ballots but their votes were not counted, *id.*; and

- Cicarella promoted his candidacy by slandering Burns when he told NHFT members that Burns used drugs and that Burns would "bankrupt the union" if elected.  *Id.*

Burns also, "right after" he filed his January 24, 2019 election protest, filed a separate complaint with the AFT Connecticut President alleging NHFT President Dave Cicarella was misappropriating NHFT funds.  Thomas Burns Deposition Transcript dated November 16, 2020, [ECF No. 38-14], ("Burns Depo. Tr.") at 66:9-67:10 ("Q. Okay. When was it that you made the financial practices complaint [regarding Cicarella misappropriating NHFT funds]? A. It was -- I think I did that to

Mrs. Hochadel, who is the AFT Connecticut president. . . . it was probably after the January 24th thing, after my election complaint.  Probably right after that.").[1]  AFT Connecticut investigated Burns' financial practices complaint, hiring an outside law firm to investigate Burns' allegations against Cicarella.  Second Declaration of David Strom dated August 24, 2020, [ECF NO. 28-3 at 1-5] ("Second Strom Decl.") ¶ 19 ("In 2019, AFT Connecticut commissioned Michael Doyle of the law firm Ferguson, Doyle, & Chester, P.C. to investigate allegations that NHFT President Dave Cicarella had engaged in financial misconduct while serving as President."); [ECF No. 28-3 at 30-47 (Second Strom Decl. Ex. C) ("Doyle Investigative Report")].

Burns' financial practices complaint to AFT Connecticut consisted of the following allegations:

- Cicarella, as NHFT's President, was "tak[ing a] car payment of $400/month even though the car ha[d] been paid off," Doyle Investigative Report at 1;

- Cicarella was "tak[ing] a payment of $61/month for [a] Sirius radio subscription," *id.*;

- Cicarella was possibly using "union vendors for private service using union funds (i.e. computer service at home for more than just his Union computer, etc.)," *id.*;

- Cicarella was possibly "us[ing] the Union credit card inappropriately (gifts, other)," *id.*;

---

[1] Burns' late January 2019 complaint to AFT Connecticut regarding Cicarella's alleged misappropriation of NHFT funds is not in the record.

- **Cicarella was possibly "us[ing] union funds to benefit certain union members over others (i.e. – travel to conventions- room arrangements as well as individual vs. family allowance)," *id*.; and,**

- **Cicarella was committing "[o]ther possible misuse of funds." *Id.***

 **By letter dated March 5, 2019, NHFT denied Burns' January 24, 2019 election protest.  Pl.'s Stmt. ¶ 6; Def.'s Stmt. ¶ 6; First Strom Decl., Ex. A, [ECF No. 18-2 at 7-12 ("NHFT Protest Denial")]; Declaration of Thomas Burns dated March 16, 2020 ("Burns Decl.") ¶ 5, [ECF No. 23-2].  NHFT determined the following:**

- **"MK Election Services fully and transparently explained the aforementioned ballot mixing issues caused by USPS sorting . . . and also detailed how MK Election Services properly secured all ballots for all elections (including the NHFT's) under its charge," NHFT Protest Denial at 9;**

- **"We find that neither the intention, tone, content nor informational nature of the [NHFT newsletter] article indicate an attempt to further the campaign of David Cicarella's candidacy," *id.* at 10;**

- **"President Cicarella and Treasurer Pantaleo fully explained that the NHFT has a longstanding practice of presenting gift cards to teachers each year who have achieved 'milestones' in their careers of twenty-five (25) or thirty (30) years of service to the New Haven Public Schools. . . . In terms of the complainant's allegation that David Cicarella misused union funds and therefore violated federal statutes concerning elections to purchase gifts for his supporters . . . such allegations . . . are mere hearsay and not based in actual fact, and therefore, no violation legal or otherwise occurred," *id.* at 11;**

- **"While purposefully offensive comments pertaining to individual candidates is [sic] inappropriate and undermining to a positive campaign culture, we . . . find that such derogatory, pejorative gossip indeed occurred from candidates and their many supporters on all sides. . . . We cannot police the comments or social media claims made by 51 candidates nor 1800 members during the general election,"** *id.*; and

- **"We . . . unanimously affirm the certification of this election's results and deny the complainant's request to overturn and rerun this election."** *Id.* at 12.

By letter dated March 22, 2019, Burns filed an appeal of the NHFT denial of his January 24, 2019 election protest with the AFT Secretary Treasurer.  Pl.'s Stmt. ¶ 7; Def.'s Stmt. ¶ 7; [ECF No. 23-6 ("AFT Protest Letter")]; Burns Decl. ¶ 6.  In the letter, Burns provided amplifying information regarding his claims with comments regarding how NHFT's denial of his protest was improper.  AFT Protest Letter.  On May 6, 2019, NHFT provided amplifying information to AFT regarding why it denied Burns' January 24, 2019 election protest.  [ECF No. 18-2 at 31-34].

While AFT Connecticut was investigating Burns' complaint regarding Cicarella's allegedly improper financial practices, Burns met with Mr. Cicarella, NHFT Executive Vice President Pat DeLucia, and NHFT attorney Eric Chester in the middle of April 2019.  Burns Depo. Tr. at 78:6-12.  During that meeting, Cicarella asked Burns how he could get the financial practices complaint against him Burns filed with AFT Connecticut to go away and Burns told Cicarella he would have to

go away, meaning that Cicarella would need to resign as president of NHFT.  Pl.'s Stmt. ¶ 9; Def.'s Stmt. ¶ 9; Burns Depo. Tr. 77:2-85:25.

In late April 2019, Burns attended a second meeting with Cicarella, DeLucia, and Chester.  At that meeting, Burns stated that he was "not going to go to the police if [Cicarella] step[ped] down," and the participants discussed creating a written agreement that would memorialize that agreement.  Burns Depo. Tr. 105:16-25.  The participants also discussed what would happen with respect to the NHFT presidency and executive vice presidency if Cicarella stepped down, and they stated that NHFT Vice President Pat DeLucia would become president and could then appoint an executive vice president.  *Id.* at 106:4-23.  Participants Cicarella and Chester also surmised that DeLucia could appoint Burns as NHFT executive vice president; then, if DeLucia retired, Burns would become president of NHFT. *Id.* at 106:24-107:24. The meeting ended without a written agreement being drafted.

Cicarella did not step down.  Instead, on May 6, 2019, Cicarella filed, with the assistance of newly retained Attorney William Dow, a report with the New Haven Police Department stating Burns had attempted to extort him.  Pl.'s Stmt. ¶ 10; Def.'s Stmt. ¶ 10; First Strom Decl., Ex. A, [ECF No. 18-2 at 35-36 (The "Dow Letter") ("Mr. Cicarella has filed a report with the New Haven Police Department")]; Cicarella Decl. ¶ 7 ("In May 2019, I engaged an attorney, William Dow, to assist me with the filing of a criminal complaint with the New Haven Police Department.  The complaint I filed stated that Thomas Burns had extorted me when he threatened to publicize and/or report to the authorities his allegations that I had misused union funds unless I resigned as NHFT President.").  The same day, Cicarella brought the

extortion allegation to AFT's attention.   Pl.'s Stmt. ¶ 12; Def.'s Stmt. ¶ 12.   In addition, NHFT's attorney Eric Chester called Burns to warn him about the police report and to tell him that Dow would be contacting him, and suggested Burns hire an attorney.   Burns Depo. Tr. 115:25-116:7; Declaration of Eric Chester dated January 26, 2021 ¶ 6, [ECF No. 38-21].

On May 8, 2019, Dow sent Burns a letter informing Burns that his conduct constituted criminal extortion and informing Burns of the May 6, 2019 police report. The letter further notified Burns that any future extortionate conduct would be reported to the New Haven Police Department and could possibly result in civil action.   Pl.'s Stmt. ¶ 11; Def.'s Stmt. ¶ 11; Dow Letter, [ECF No. 18-2 at 35-36].

On May 13, 2019, Burns filed a complaint with the Secretary of Labor regarding the December 4, 2018 election.   Pl.'s Stmt. ¶ 13; Def.'s Stmt. ¶ 13; [ECF No. 23-4 ("First Sec'y Labor Complaint")].

On May 21st and 22nd, the AFT Executive Council held a meeting to discuss, *inter alia*, Burns' election protest and the recently reported alleged extortion of Cicarella by Burns.   [ECF No. 28-3 at 7-12].   AFT General Counsel David Strom described the issues:

> The second investigation request involves our New Haven Federation of Teachers local.  Let me say that this matter involves what is not unusual election allegations, internal election allegations.  And then there is a piece of this which makes this a very high priority case and different from many other internal elections. . . .
> [Burns'] allegations are in the packet.  They're not particularly -- I mean, they're important.  They're very important.  Don't get me wrong. But they're the kind of allegations that many of you have seen before in elections.   They involve [ballot mixing, defamatory communications, etc.]. . . . But this is the important part of this investigation which does make it very different.  About three weeks ago Mr. Burns had a meeting with the president, the first vice

president, and the AFT Connecticut lawyer. In that meeting Mr. Burns said to the president, 'I have information on your use of auto expenses that were reimbursed and on gift cards that went to members that I'm going to go to the public and to the authorities with unless you resign immediately.' That would have then created a vacancy in the president's position. The first vice president would have risen up. A vacancy would have been created in the first vice president slot. That would have been filled by Mr. Burns in this scheme. Then the first vice president will resign and there will be an election for the president. So there's the scheme. But you can see what's going on here. This is an extortion attempt.

So realizing how serious this was, we consulted with a criminal lawyer in Connecticut, who after carefully interviewing the president of this local, the lawyer who was present at this meeting, and taking a careful look at Connecticut law, reached the conclusion that there had been an attempted extortion. So a police report was filed. . . .

So this has just happened. It's very much part of what has to be investigated as does the fact that this election will be reviewed by the Department of Labor as well as us. So, you know, we will be obviously taking a very careful eye and look at all of this.

We asked the Department of Labor to hold up in their investigation; they refused. That's not surprising given this administration.

So it's a very important investigation. It will require us to probably move with a higher degree of speed and to get to you a recommendation by the July council meeting so that we will have a decision before the Department of Labor issues its decision.

[ECF No. 28-3 at 8-10]. Following this, the AFT's Secretary-Treasurer moved to appoint AFT Vice President Ted Kirsch and two assistants to investigate the extortion matter, which passed. *Id.* at 10.

By letter dated May 24, 2019, Kirsch notified Burns that there would be a hearing on June 6, 2019 to address Burns' January 24, 2019 election protest, NHFT's response thereto, and "the circumstances that led to" the May 8, 2019 letter to Burns from Dow. Pl.'s Stmt. ¶ 14; Def.'s Stmt. ¶ 14; First Strom Decl. ¶ 5, [ECF No. 18-1]; First Strom Decl., Ex. A, [ECF No. 18-2]; Burns Decl. ¶ 8, [ECF No. 23-2]. In the "Ground Rules" section, the Notice of Hearing stated:

> **This is a fact-finding and <u>not</u> an adversarial proceeding.  The purpose of the hearing is to present evidence and testimony to the AFT Committee so that it can prepare a report and recommendations to the full AFT Executive Council.   The questions to the witnesses will primarily come from the Committee.    There will be limited crossexamination.  While the parties are free to have legal counsel at the hearing, the role of such counsel will be limited.**

[ECF No. 18-2 at 3 (emphasis in original)].   Burns was asked to provide a list of witnesses he intended to have testify at the hearing by June 3, 2019.  Pl.'s Stmt. ¶ 15; Def.'s Stmt. ¶ 15; First Strom Decl. ¶ 5, [ECF No. 18-1]; Burns Decl. ¶ 8, [ECF No. 23-2].

On May 24, 2019, Burns emailed a list of witnesses to AFT and AFT General Counsel David Strom.  Burns concluded this email by stating, "and the Willie Dow thing?? whats [sic] that?? [] a joke??"  Pl.'s Stmt. ¶ 16; Def.'s Stmt. ¶ 16; [ECF No. 23-15 ("Burns witness list email")].

On May 30, 2019, Burns and Strom spoke on the telephone.  Burns Depo. Tr. at 139:16-141:17.  When Burns told Strom he did not understand why the alleged extortion issue would be discussed at the June 6, 2019 hearing, because it "doesn't have anything to do with [Burns' election] complaint," Strom responded that the hearing would be "not adversarial" and "just a fact finding, friendly thing."  *Id.* at 141:10-17.

At no point prior to the June 6, 2019 hearing, did Strom, AFT, or NHFT explain that the June 6, 2019 hearing could result in Burns' disqualification from running for office or any other union discipline.  Pl.'s Stmt. ¶ 19; Def.'s Stmt. ¶ 19; Burns Decl. ¶ 10.

At the June 6, 2019 hearing, when the chairperson introduced the extortion issue, Burns stated: "No, the Willy Dow letter. We're not going to do that? I hope we're not doing it because it wasn't [] my [election] complaint."  Pl.'s Stmt. ¶ 20; Def.'s Stmt. ¶ 20; Transcript of June 6, 2019 Investigative Hearing, [ECF No. 23-7].

On July 10, 2019, AFT issued a decision ordering a rerun of the December 4, 2018 election because a chapter of nurses and teachers at a private school were excluded from the election.  Burns had not raised that issue in his election protest. Pl.'s Stmt. ¶ 21; Def.'s Stmt. ¶ 21; [ECF No. 23-8 ("AFT July 10, 2019 Decision")].

The July 10, 2019 Decision also disqualified Burns from participating in the rerun election, as well as the next regularly scheduled election, and from holding union office during that entire time because of Burns' allegedly extortionate conduct.  Pl.'s Stmt. ¶ 23; Def.'s Stmt. ¶ 23; AFT July 10, 2019 Decision at 7.

On July 12, 2019, Attorney Doyle provided his completed investigation to AFT Connecticut regarding Burns' complaint that Cicarella had misappropriated union funds.  [ECF No. 28-3 at 30-47].  Doyle found Burns' allegations "troubling," and made some recommendations for improving NHFT's financial practices, but found that Burns' allegations, "based on a preponderance of the evidence," "c[ould] not be upheld" because "[t]here is no evidence or sentiment that Cicarella ha[d] been untruthful or deceitful, nor that he acted with intent to benefit financially from his status as President."  *Id.* at 42.

By email dated November 20, 2019, Burns requested that the NHFT election trustees "make a decision" concerning his candidacy in the required rerun election.  Pl.'s Stmt. ¶ 27; Def.'s Stmt. ¶ 27; [ECF No. 23-9].  The same day, Burns

emailed AFT General Counsel Strom appealing AFT's decision to disqualify him as a candidate in the rerun election.  Pl.'s Stmt. ¶ 27; Def.'s Stmt. ¶ 27; [ECF No. 23-10].

By letter dated November 22, 2019, Strom told Burns there was no ability to appeal the AFT's July 10, 2019 decision; however, Strom allowed Burns five days to provide new evidence. Pl.'s Stmt. ¶ 28; Def.'s Stmt. ¶ 28; [ECF No. 23-11].  Strom also stated that Burns' arguments to date "ha[d] no merit" because, in part, "[y]ou were provided full notice of the issues that were going to be addressed at the hearing."  *Id.* at 1.  Strom stressed that "labor organizations governed by the [LMRDA] have the right to disqualify candidates for office due to detrimental conduct that has been proven through a process that is fully compliant with Title IV of the LMRDA."  *Id.* at 2.  Strom also noted that the Department of Labor was "comfortable" with the "AFT['s] decision" disqualifying Burns from participating in the rerun election.  *Id.* at 3.

By email and letter dated December 2, 2019, Burns responded to Strom's November 22, 2019 letter, providing information about a recent November 5, 2019 NHFT meeting that Burns thought might be helpful to his case.  Pl.'s Stmt. ¶ 29; Def.'s Stmt. ¶ 29; [ECF No. 23-12].   By letter dated December 6, 2019, Strom informed Burns that his December 2, 2019 letter was untimely; however, this letter substantively addressed Burns' allegations and denied them, arguing that "[t]he objective factual record here demonstrates that you were afforded due process." Pl.'s Stmt. ¶ 30; Def.'s Stmt. ¶ 30; [ECF No. 23-13].

By letter dated December 10, 2019, DOL's Office of Labor-Management Standards dismissed Burns' first complaint concerning his protest of the December 4, 2018 election.  Pl.'s Stmt. ¶ 31; Def.'s Stmt. ¶ 31; [ECF No. 23-14].

On December 18, 2019, Burns filed a second complaint with DOL, alleging the union violated Title IV of the LMRDA by disqualifying him to be a candidate in the February 2020 rerun election.  [ECF No. 1 ¶ 36].

NHFT completed its rerun election on February 27, 2020.  Pl.'s Stmt. ¶ 32; Def.'s Stmt. ¶ 32.  Burns was not permitted to run as a candidate for President during the rerun election.  Pl.'s Stmt. ¶ 33; Def.'s Stmt. ¶ 33.

The Department of Labor investigated Burns' second complaint regarding his disqualification for the February 2020 rerun election.  [ECF No. 23-1 at 9-10].  As part of that investigation, on March 5, 2020, the AFT and NHFT submitted a joint statement to the DOL, signed by AFT's General Counsel Strom, arguing that "[i]t is the position of the AFT and [NHFT] that the AFT provided Mr. Burns with 'written specific charges' that were more than sufficient to satisfy the requirements of the Act."  [ECF No. 28-7 at 14-22].  This was because the May 24, 2019 Notice of Hearing had, according to Strom, stated that the June 6, 2019 AFT Executive Council hearing would consider "whether the allegations concerning Mr. Burns' threats to Mr. Cicarella, where Mr. Burns stated he would go the authorities and the media with allegations of financial impropriety unless Mr. Cicarella stated he would resign from office, are accurate and if they are what should the consequences be."  *Id.* at 15-16.  Thus, although "[t]he requisite degree of specificity required to meet the statutory standards will, of necessity, vary from case to case[, t]he circumstances

surrounding an alleged disciplinary infraction by a union member, and the time and place as nearly as can be ascertained, constitute the minimal information that the union should disclose to the accused in order to afford him a reasonable opportunity to prepare his defense." *Id.* at 17 (quoting *Gleason v. Chain Serv. Rest.*, 300 F. Supp. 1241, 1251 (S.D.N.Y. 1969), *aff'd* 422 F.2d 342 (2d Cir. 1970)).  In sum, Burns' "allegedly extortionate statements were the reason for the disciplinary action." *Id.* at 20.

After completing its investigation, including consideration of the AFT and NHFT's joint statement of March 5, 2020, the Department of Labor found probable cause that the union violated Title IV of the LMRDA, 29 U.S.C. §§ 481-83.  [ECF No. 23-1 at 9-10].  The Department concluded that AFT failed to notify Burns that the June 6, 2019 hearing could result in the union taking disciplinary action against him, including disqualifying him from participating in the rerun election. *Id.*  After the Department concluded its investigation of Burns' complaint, the Secretary of Labor, through the United States Attorney's Office, commenced this action on April 3, 2020. *Id.*; [ECF No. 1].

On June 16, 2020, NHFT moved to dismiss the Complaint, arguing that Plaintiff had not stated a claim for which relief could be granted because whether Burns had been provided with adequate written notice of the charges against him was irrelevant because NHFT's actions did not constitute "discipline" that would trigger the written notice requirement under 29 U.S.C. § 411(a)(5).  [ECF Nos. 17, 18].  Rather, NHFT was simply exercising its remedial powers to correct deficiencies in previous elections, in this case the December 4, 2018 NHFT election,

when it barred Burns from running in the rerun election held in February 2020; thus, the Act's written notice requirement was not triggered and the Act was, therefore, not violated.  [ECF No. 18].

On July 24, 2020, Plaintiff filed a combined Opposition to NHFT's Motion to Dismiss and Motion for Partial Summary Judgment.  [ECF No. 23].  Plaintiff argued that not only did NHFT discipline Burns when it barred him from running in the February 2020 rerun election, which triggered the written notice requirement of 29 U.S.C. § 411(a)(5), but the written notice provided was deficient in significant ways, thus violating the statute and requiring the Court to overturn the rerun election.  *Id.*

On February 1, 2021, NHFT filed a cross-motion for summary judgment, reiterating its argument that Burns had not been disciplined but also, now that significant discovery had been taken and analyzed, arguing that the written notice Burns was provided was adequate under 29 U.S.C. § 411(a)(5).  [ECF No. 38]. Plaintiff opposed NHFT's cross-motion on February 24, 2021, reiterating its argument that NHFT had indeed disciplined Burns, which triggered the written notice requirement of 29 U.S.C. § 411(a)(5), and also arguing that the written notice Burns was provided was inadequate to apprise him of the charges against him. [ECF No. 41].

II.    <u>Legal Standard</u>

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant

is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint.  *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).  "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "At the second step, a court should determine whether the 'wellpleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no genuine factual disputes exist.  *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Reeves v. Sanderson*

16

*Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-00481, 2004 WL 2472280, at *4 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (citing *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)); *Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011).  Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  *Gottlieb*, 84 F.3d at 518.  Where there is only a scintilla of evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726-27 (2d Cir. 2010).

Title IV of the LMRDA requires that union members be allowed to run for union office.  *See* 29 U.S.C. § 481(e) ("In any election required by this section . . .

every member in good standing shall be eligible to be a candidate and to hold office (subject to section 504 and to reasonable qualifications uniformly imposed).").[2]

A union member who believes he or she was improperly prevented from running for union office, "who has exhausted the remedies available under the constitution and bylaws of such organization and of any parent body," "may file a complaint with the Secretary [of Labor] within one calendar month thereafter." 29 U.S.C. § 482(a). "The Secretary shall investigate such complaint and, if he finds probable cause to believe that a violation of this title has occurred and has not been remedied, he shall, within sixty days after the filing of such complaint, bring a civil action against the labor organization as an entity in the district court of the United States." 29 U.S.C. § 482(b).

"If, upon a preponderance of the evidence . . . , the court finds . . . that the violation of [29 U.S.C. § 481] may have affected the outcome of an election, the court shall declare the election, if any, to be void and direct the conduct of a new election under supervision of the Secretary and, so far as lawful and practicable, in conformity with the constitution and bylaws of the labor organization." 29 U.S.C. § 482(c).

The rule that unions should be allowed to set "reasonable qualifications uniformly imposed" for candidates for union office was not intended to be given a "broad reach," *Wirtz v. Hotel, Motel & Club Emps. Union, Local 6*, 391 U.S. 492, 496-

---

[2] Section 504 disqualifies union members who are or have ever been members of the Communist Party and members convicted of serious crimes such as, *e,g,,* robbery, murder, and arson, from running for union office.  29 U.S.C. § 504.  This Section obviously does not concern us here.

98 (1968), and Department of Labor regulations state that 29 U.S.C. § 481(e)'s requirement for reasonable qualifications for union office candidacy "was not intended to limit the right of a labor organization to take disciplinary action against members guilty of misconduct," as "long as such action is conducted in accordance with section 101(a)(5)."  29 C.F.R. § 452.50.  In other words, every union member must be afforded the opportunity to run for union office unless he or she runs afoul of narrowly drawn, uniformly imposed and reasonable regulations, or has been guilty of misconduct and subjected to the disciplinary sanction of disqualification for running from union office.

29 U.S.C. § 411(a)(5) mandates that "[n]o member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; [and] (C) afforded a full and fair hearing."  29 U.S.C. § 411(a)(5).

III.   **The Parties' Arguments**

A.   **NHFT's Argument**

NHFT argues first that Plaintiff fails to state a claim for which relief can be granted because the "written specific charges" required by 29 U.S.C. § 411(a)(5) before discipline can be imposed, which Plaintiff claims were inadequate, were not required.  [ECF No. 18 at 10-15].  NHFT notes that Title IV's requirement that every union member in good standing be allowed to run for union office subject to reasonable qualifications uniformly imposed is fundamentally different than Title

I's requirement that written specific charges be presented before a union member can be disciplined, and that "[d]iscipline and eligibility determinations are subject to different requirements under the LMRDA because they serve different union interests." *Id.* at 9.

NHFT cites *United States v. Int'l Bhd. of Teamsters*, 156 F.3d 354 (2d Cir. 1998) at length. [ECF No. 18 at 10-15]. In that case, the Second Circuit affirmed a Southern District of New York court that held that a union member's disqualification from a rerun election was not "discipline" because discipline by its nature was "retrospective in focus, administering penalties in relation to the gravity of the past wrong," but the court held that in this case the rerun election disqualification was an exercise of the union's "remedial authority 'to ensure a fair rerun election and to protect the integrity of the electoral process.'" *Id.* at 10 (quoting *Teamsters*, 156 F.3d at 362). NHFT argues that "[s]uch 'forward-looking and corrective' action is not 'discipline' and 'd[oes] not implicate § 101(a)(5) of the LMRDA.'" *Id.* (quoting *Teamsters*, 156 F.3d at 362). NHFT also notes that in *Teamsters* the election officer charged with enforcing the consent decree that governed the proceedings in that case lacked the authority to impose discipline, which was the responsibility of a separate union disciplinary board, and that the same is true here, as the AFT Executive Council was only concerned with the December 2018 election and lacked the authority to impose discipline. [ECF No. 18 at 11-12]. NHFT argues that Burns, when he attempted to extort Cicarella into resigning, and joined a scheme that would make him, Burns, NHFT's President, was "attempt[ing] to achieve via extortion what he was unable to achieve at the

ballot box." *Id.* at 13.  In other words, NHFT's disqualification of Burns was not discipline because NHFT was simply trying to correct Burns' attempt to undo the December 2018 election, as in *Teamsters*.

NHFT concedes that "[t]o be sure, in some circumstances disqualification from eligibility for union office can amount to discipline that entitles a union member to the procedural protections of Section 101(c)(5)."  [ECF No. 18 at 14 (citing *Schonfeld v. Penza*, 477 F.2d 899, 904 (2d Cir. 1973) ("holding that there are circumstances in which 'rendering a man ineligible from seeking union office . . . affects him as a member' and permits him to challenge the fairness of the procedures afforded to him under LMRDA Title I")].  But, according to NHFT, "where, as here, both the underlying misconduct and the resolution adopted are tied to the candidate's involvement in the union-election process, the union's action is best understood as an exercise of its remedial authority to impose eligibility requirements, and not as a punitive measure to which the procedural safeguards of Section 101(c)(5) apply."  [ECF No. 18 at 14 (citing *Teamsters*, 156 F.3d at 362)].  "In sum, consistent with its limited jurisdiction, the AFT Executive Council determined that Burns was ineligible to run for Local President in the ordered rerun election as a prospective remedial measure designed to reform NHFT's election process after Burns attempted to subvert that process by extorting the incumbent Local President Cicarella out of office.  Therefore, Burns was not disciplined and was not entitled to the procedural safeguards of LMRDA Title I. Accordingly, the Secretary has failed to state a claim upon which relief may be

granted, and the Complaint should be dismissed under Rule 12(b)(6)."  [ECF No. 18 at 15].

NHFT argues further that even if the Court holds that the union's disqualification of Burns was disciplinary in nature, Burns was provided all the notice that the "written specific charges" mandate requires.  [ECF No. 38-1 at 17-21].  First, according to NHFT, "[t]his LMRDA provision does not create a technical pleading requirement because '[u]nion officials cannot be expected to frame their charges and specifications technically as formal legal pleadings.'"  *Id.* at 18 (quoting *Gleason*, 300 F. Supp. at 1251).   Rather, the LMRDA only requires, according to NHFT, that "the written specific charges be 'specific enough to inform the accused member of the offense that he has allegedly committed.'" *Id.* (quoting *Int'l Bhd. of Boilermakers v. Hardeman*, 401 U.S. 233, 245 (1971)).  In addition, NHFT asserts, the written specific charges need only concern "the *conduct* engaged in by the member that the union contends violated the union's internal rules," *id.* (citing *Hardeman*, 401 U.S. at 245), and "not the legal import of those facts," *id.* at 19 (emphasis in original) (citing *Johnson v. Nat'l Ass'n of Letter Carriers Branch 1100*, 182 F.3d 1071, 1075 n.5 (9th Cir. 1999), nor on "the possible consequences to the member if he is found to have committed the alleged offense."  *Id.* at 20 (citing 29 U.S.C. § 411(a)(5)(A) and cases).

Here, that standard is met, according to NHFT, because "there can be no real doubt that the May 24 Notice of Hearing adequately informed Tom Burns of the charges he faced," which, NHFT argues, is all the "written specific charges" mandate requires.  *Id.* at 21.  The May 24 Notice of Hearing informed Burns that the

June 6 hearing would investigate the "circumstances that led to the attached letter to Mr. Burns from Attorney William Dow."  *Id.*  "The May 24 Notice of Hearing, in turn, attached the Dow Letter . . . , which described how Burns had made accusations against Cicarella and threatened to report and/or publicize those accusations unless Cicarella resigned as president of NHFT.  The Dow Letter went on to specifically state that those actions 'constitute[d] extortion,' and warned him against any repetition of that conduct.  That was 'enough to inform [Burns] of the offense that he ha[d] allegedly committed.'"  *Id.* (quoting *Hardeman*, 401 U.S. at 245 and citing *Chao v. IBEW Local 1357*, 232 F. Supp. 2d 1119, 1130 (D. Haw. 2002) ("possibly imprecise charges alleging the member's failure to document expenditures were adequate because the charging letter referred to a more specific audit report that was available at the union's office")).  Moreover, NHFT argues, Burns testified at his deposition that he "understood when he received the Dow Letter that his alleged wrongdoing was that he extorted Cicarella through his comments at the two meetings he had in April 2019 with Cicarella, Chester, and DeLucia at NHFT Headquarters."  *Id.* at 21-22 (citing Burns Depo. Tr. at 123:24-124:9, 140:21-141:3).  And "Burns never asked AFT for clarification regarding the charges," *id.* at 22-23, filed a witness list that included Attorney Eric Chester, whose only connection to the case was his presence at the two meetings where Burns allegedly extorted Cicarella, *id.* at 23, and Burns, on the day of the hearing, did not object to the inclusion of the extortion topic in the hearing.  *Id.*  In sum, NHFT argues, Burns received adequate notice of the charges against him, which is what

the LMRDA requires; therefore, "summary judgment should be entered for the Defendant." *Id.* at 23-24.

Finally, NHFT argues, even if there was a "technical defect" in the May 24 Notice of Hearing, Burns was not prejudiced, and "absent a showing of prejudice to the member's defense, no violation of Section 101(a)(5) can be established." *Id.* at 24-26 (citing cases including two Department of Labor "Closing Letters" dismissing union member complaints on lack of prejudice grounds).

That Burns was not prejudiced by any technical defect in the May 24 Notice of Hearing is shown, according to NHFT, by "the undisputed evidence [which] establishes that he did *nothing* to prepare for the June 6, 2019 investigatory hearing." *Id.* at 26 (emphasis in original).  In addition, Burns provided equivocal testimony as to whether he would have hired an attorney to represent him at the June 6 hearing had he known he would be subject to disciplinary action, arguing at certain points that he would not have because he considered the extortion charges to be "fake," *id.* at 26-28 (citing Burns Depo. Tr. 84:16-85:2, 160:4-12), but "later, on redirect by the government, flip[ping] his testimony and stat[ing] that he would have hired an attorney." *Id.* at 29 (citing Burns Depo. Tr. 208:10-209:7).  "That equivocal and conflicted testimony hardly constitutes the undisputed evidence of prejudice DOL needs to get summary judgment." *Id.* (citing *D'Alessandro v. Am. Airlines, Inc.*, 139 F. Supp. 2d 305, 311-12 (E.D.N.Y. 2001) ("genuine issues of material fact existed as to willfulness where driver of mobile lounge contradicted himself but admitted in some portions of his testimony that he was aware of the risk of passenger falls")).  In sum, NHFT argues, whether Burns was prejudiced by

a technical defect in the May 24 Notice of Hearing is "subject to genuine dispute" and "[t]herefore, even if the Court denied NHFT's Cross-Motion for Summary Judgment on this third independent ground, summary judgment for the DOL would be improper, and a trial would be needed on this question of whether Burns was in fact prejudiced by any defect in the May 24 Notice.  Accordingly, DOL's Motion for Partial Summary Judgment should be denied because it has not established as a matter of law that Burns was prejudiced."  *Id.* at 29-30.

### B.  Plaintiff's Arguments

The Plaintiff, Secretary of Labor, argues first that Thomas Burns was, in fact, disciplined within the meaning of the LMRDA, and that the AFT/NHFT were not merely using their power as a remedial tool to correct deficiencies in the December 4, 2018 NHFT election.

Plaintiff argues, in general terms, that through the LMRDA, "Congress sought to 'protect the rights of rank-and-file members to participate fully in the operation of their union through processes of democratic self-government, and, through the election process, to keep the union leadership responsive to the membership'" [ECF No. 23-1 at 10 (quoting *Hotel, Motel & Club Emps. Union, Local 6*, 391 U.S. at 497)], and that "Congress enacted the safeguards of Title I and Title IV of the LMRDA 'to provide a fair election and guarantee membership participation.'"  *Id.* (quoting *Am. Fed'n of Musicians v. Wittstein*, 379 U.S. 171, 182 (1964)).

In specific, Plaintiff argues that "Section 401(e) of the LMRDA," codified at 29 U.S.C. § 481(e), which states that "every member in good standing shall be

eligible to be a candidate and to hold office (subject to section 504 and to reasonable qualifications uniformly imposed)," requires "strict compliance with Section 101(a)(5)'s prohibition against improper discipline." *Id.* Plaintiff notes that the Supreme Court has held that the "reasonable qualifications uniformly imposed" requirement should not be given a "broad reach," *Hotel, Motel & Club Emps., Local 6*, 391 U.S. at 499, i.e. it should be narrowly construed. *Id.* at 11. "Denying the right to run for office strips a member of his right to participate fully in the democratic union process, as guaranteed by Title IV of the LMRDA. Accordingly, a member cannot be denied the right to run for office unless he has been properly disciplined or fails to meet reasonable candidate eligibility requirements permitted by section 401(e)." *Id.* (citing 29 U.S.C. § 481(e)).

Plaintiff argues further that "[i]t is well founded that when a union prohibits a member from seeking office in future elections, such action constitutes discipline." *Id.* at 12 (citing *Schonfeld*, 477 F.2d at 904 and *Newman v. Local 1101, Commc'ns Workers of Am.,* 570 F.2d 439, 448 (2d Cir. 1978), both of which held that "candidacy for union office [i]s a right of union membership," implicating the protections of LMRDA Title I and its requirement that before a member is disciplined he be provided with written specific charges).

Plaintiff distinguishes NHFT's *Teamsters* case, which NHFT relies heavily upon and which found that disqualification for future office was merely exercise of a union's remedial power to correct deficiencies with a previous election. First, Plaintiff notes that *Teamsters* held that "[u]nion action affecting a membership right constitutes 'discipline' for purposes of triggering § 101(a)(5) where that action

is 'imposed as a sentence on an individual by a union in order to punish a violation of union rules.'"   [ECF No. 23-1 at 12 (quoting *Teamsters*, 156 F.3d at 361 (citing *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 92 n.15 (1989))].  And *Teamsters* differed from the instant matter, according to Plaintiff, in two significant ways.  First, in *Teamsters*, unlike here, "an election officer was appointed pursuant to a consent decree to supervise the electoral process."  *Id.* at 13.   Second, "unlike the present case, the election officer [in *Teamsters*] disqualified the incumbent President from running for office in the rerun election after an investigation uncovered he had knowingly participated in campaign finance abuses during the original election."  *Id.* (citing *Teamsters*, 156 F.3d at 358-59).  Specifically, Plaintiff argues, "the incumbent President's disqualification in *Teamsters* was to remedy campaign finance violations that occurred during the original election.  Here, Burns was barred from being a candidate in the rerun election for alleged post-election conduct wholly unrelated to the previous election or his campaign in that election," and which occurred five months after the previous election.  *Id.*

Moreover, Plaintiff argues, the AFT Executive Council that disqualified Burns, does not, unlike the election officer in *Teamsters*, "supervise local union officer elections to ensure they are conducted in a fair and democratic manner," and Burns' conduct for which he was disciplined, i.e. extortion concerning "what Burns believed to be questionable monthly allowances Cicarella received," had nothing to do with the December 4, 2018 election, unlike in *Teamsters*.  *Id.* at 15.  Therefore, "before Defendant could lawfully discipline Burns, it was required to

provide him with the rights enumerated in section 101(a)(5)." *Id.* (citing 29 U.S.C. § 411(a)(5)).

Plaintiff argues further that Defendant failed to provide Burns with the written specific charges required by 29 U.S.C. § 411(a)(5) before imposing discipline on him.  Plaintiff argues that Defendant was required to "provide sufficiently detailed information of the alleged offense(s) to enable the accused to prepare a defense," and notes that "the accused's independent knowledge concerning the circumstances of his own alleged wrongdoing does not excuse a union's obligation to comply with the notice requirements of section 101(a)(5)." *Id.* at 16 (citing cases).

Plaintiff argues that the May 24 Notice of Hearing was deficient because "Burns was not notified: that the hearing was to be disciplinary in nature; that the allegation of extortion constituted a 'charge;' or what, if any, consequences may follow from this hearing." *Id.* at 17.  Moreover, "the hearing notice specified the contrary – that the hearing was a fact-finding proceeding and not an adversarial proceeding.  Additionally, the hearing notice stated the purpose of the hearing was to 'prepare a report and recommendation to the full AFT Executive Council,' not to determine the consequences or punishment that would result from Burns' alleged extortionate conduct." *Id.*  Plaintiff notes that Burns objected to discussion of the extortion topic at the June 6 hearing when he submitted his witness list and at the hearing, and argues that "the fact that Burns did ultimately discuss the events surrounding the extortion allegation did not absolve the union of its responsibility

to provide Burns with written specific charges to enable him to prepare a defense against potential discipline." *Id.* at 17-18.

> Plaintiff sums up:
>
> The disciplinary action imposed against Burns affects his rights as a union member because the union disqualified him from running for office in [NHFT]'s February 2020 rerun election, as well as in the next regularly-scheduled election. Defendant's failure to provide Burns with written specific disciplinary charges constitutes a violation of his section 101(a)(5) rights. Defendant's actions denied Burns the due process and basic fairness required by section 101(a)(5). Relying upon this unlawful disciplinary action, Defendant denied Burns the opportunity to run as a candidate in the February 2020 rerun election, violating section 401(e) of the LMRDA.

*Id.* at 18.

Finally, Plaintiff argues that "Section 402(c) of the LMRDA requires that the district court declare a contested election void and order a new election under the government's supervision where a violation of section 401 'may have affected the outcome of the election.'" *Id.* (quoting 29 U.S.C. § 482(c)(2)). Plaintiff argues that "[o]nce the Secretary establishes a violation of section 401, he has established a *prima facie* case that the violation may have affected the outcome of the election, and the burden of proof shifts to the union to produce tangible evidence that the results of the election would have been the same absent the violation." *Id.* at 18-19 (citing cases). Plaintiff notes that "[t]he presumption of effect is quite strong," and that

> [O]nce a Section 481 violation has been demonstrated, a very substantial burden falls upon a defendant union. It must show by a preponderance of the evidence that the particular violation did not affect the outcome of the election. Until it does so, the presumption remains that such violation might have had an effect on the results, and this presumption of mere possible influence suffices to warrant a new supervised election.

*Id.* (quoting *Usery v. Int'l Org. of Masters, Mates & Pilots, Int'l Mar. Div.*, 422 F. Supp.

1221, 1226 (S.D.N.Y. 1976) *aff'd in part, modified in part on other grounds*, 538 F.2d

946 (2d Cir. 1976)).

> **Plaintiff argues:**
>
> **Here, Burns was nominated for, and ran for, the position of President in the December 2018 election.  When Defendant ordered a rerun election, Local 933 did not conduct new nominations for the position of President; as such, the candidates for President in the rerun election were the same as those for the December 2018 election, with the exception of Burns because Defendant barred him from being a candidate.  Absent his improper disqualification, Burns would have been on the ballot as a candidate for President in the February 27, 2020 rerun election because he was nominated and on the ballot in the original December 2018 election.   The only way to remedy this violation is to conduct a new election, including new nominations, under the supervision of the Department.**

*Id.*

IV.   **Analysis**

A.    **Defendant's Disqualification of Burns Constituted Discipline**

For the following reasons, the Court finds that when Defendant barred Burns

from running in the February 2020 rerun election, as well as the next regular union

election, and barred him from holding any union office during that entire time, it

disciplined Burns and was not simply exercising some remedial power to correct

violations Burns committed in the previous, December 2018 election.   To

understand why requires a thorough understanding of the two separate complaints

Burns filed and the consequences of each.

First, on January 24, 2019, Burns filed with NHFT a protest of the December

4, 2018 union election.  Burns complained of five election violations that he argued

required rerunning the election.  He complained that MK Election Services committed ballot handling irregularities that caused some votes to go uncounted, NHFT used its newsletter to promote Cicarella's candidacy alone, NHFT used gift cards to influence union member votes in favor of Cicarella, some late-mailed ballots were improperly counted and some members who requested duplicate ballots did not have their votes recorded, and Cicarella slandered Burns, negatively influencing some union members' perception of Burns.  [ECF No. 18-2 at 13-30 ("Burns Protest Letter")].

Separately, Burns filed a complaint with AFT Connecticut alleging that Cicarella had for some time been guilty of financial mismanagement and misappropriation of union funds.  This complaint alleged Cicarella was regularly receiving from NHFT a $400/month car payment even though his car was paid off, he was improperly receiving a Sirius radio subscription, he was using union vendors to conduct private work in his home, he was inappropriately using gift cards, he was using union funds to benefit some members over others, and possibly other financial improprieties.  [ECF No. 28-3 at 30-47].

Burns' election protest was rapidly dispatched by NHFT on March 5, 2019, just over a month after it was filed, with NHFT finding no merit in any of Burns' allegations, and "unanimously affirm[ing] the certification of this election's results and deny[ing] the complainant's request to overturn and rerun this election."  [ECF No. 18-2 at 7-12 ("NHFT Protest Denial")].  This caused Burns to quickly appeal NHFT's denial of his election protest to the AFT on March 22, 2019.  [ECF No. 23-6 ("AFT Protest Letter")].

Burns' financial practices complaint to AFT Connecticut, however, was not so easily dispatched, and lingered for almost six months, from January to July 2019, while the outside law firm Ferguson, Doyle, & Chester investigated. [ECF No. 28-3 at 30-47 (Doyle Investigative Report)].

It was this complaint that drew the attention of Cicarella, who was concerned enough about it to call a meeting with Burns in mid-April to discuss possible resolutions to it. It was at this meeting that Cicarella asked Burns how the financial practices complaint could be made to disappear, or go away, and Burns answered, "if you go away." Burns Depo. Tr. 77:2-85:25. At the second meeting between the two, Cicarella and his associates "surmised" that if Cicarella stepped down, then Vice President DeLucia would become President and he could appoint anyone of his choice to be Vice President, presumably Burns, and then if DeLucia stepped down Burns could become President.

> Q.    And so it was Dave Cicarella's idea to have Eric Chester write something down?
> A.    Yes.  That's how the [second] meeting started.  Because that was what he was saying in front of us.  He was trying to say -- I think he was trying to say maybe Tom, if I sign this, you can't do anything.  And I didn't care, you don't have to sign anything. I already did what I did.  But if you want to do that, Dave, I am not going to go to the police if you step down.  I already told you that.  But he wanted to make sure it was lock, stock and barrel if we put together this thing and we get it signed, is it legal.  And Eric said, yes, I can do that.
> Q.    And what was your understanding of what would happen to the NHFT presidency if Dave Cicarella did, in fact, step down?
> A.    That was part of the conversation at that point.  They brought up, so what would -- because they are thinking like I'm trying to get in again.  I'm out.  I lost.  I had nothing.  I gain nothing.  So my thing was that Pat -- so they said, so what happens if Dave does step down?  Who becomes president?  Because I finished second in the last election am I in?  No.  I said, no, it's -- the way, and I didn't say it, but we came to the agreement that you looked

at the bylaws and the bylaws say the vice president becomes
the president.  So Pat DeLucia would become the president at
that point.

Q.   And then what was your understanding of what would happen
with the NHFT executive vice presidency if Pat DeLucia
ascended to the presidency?

A.   By the bylaws, he gets to pick the vice president at that point.

Q.   Was there any discussion at the meeting about who he might or
might not pick to be the new executive vice president?

A.   Yes.  They surmised, Dave and Eric surmised, well, then -- this
is all their thinking -- that well then they would put you in as vice
president of the union.  Wouldn't he?  And he goes so it's a nice
supposition.  Is it possible?  Yes.  Is it probable?  No.  Because
I wasn't real happy with AFT anyway, why be a part of that
organization when they scam you and they do what they did?
So, I didn't even think of that.  All I knew is this: Dave had to go
because he was stealing.  So if he's gone, it's over.  So -- and
then Pat DeLucia comes in.  And whatever happens then was --
whatever they surmise.  And they did go through these things:
And then this would happen.  You should have seen some of
the things they came up with.  And then this would happen.  Oh,
and then Pat would step down.  He would make you vice
president -- I think they said this -- they took it five steps.  He'd
make you vice president, then he'd quit and you would become
president.   That was what they surmised. That would be
embarrassing, to me, to do anything like that, to take those
steps.  Okay.

Burns Depo. Tr. 105:16-107:24.

It is clear to the Court from this testimony that it was not Burns' idea to use
his financial practices complaint against Cicarella to accomplish through extortion
what he could not do in the election; i.e., become President of NHFT.   More
importantly, Burns' financial practices complaint was completely separate from his
election protest and had little to nothing to do with the December 2018 election.
More importantly still, even if Burns was trying to become NHFT's President
through the vehicle of his financial practices complaint against Cicarella, even if
his financial practices complaint dealt with financial improprieties in the December

2018 election, and even if the sequence of events Cicarella and his associates' suggested in the second April 2019 meeting happened, that would have been completely separate from and would not have affected the results of the December 2018 election.  The only way that election could be changed was through Burns' election protest, not through his financial practices complaint or other backroom dealings.  Unlike the official in *Teamsters*, Burns was not barred from the rerun election because of any impropriety on his part in the December 2018 election; it was for this separate, April 2019 "extortion" attempt, which the Court holds was separate from the December 2018 election.  AFT General Counsel Strom made that quite clear when he teed up Burns' election protest and "extortion" to the AFT Executive Council for decision:

> The second investigation request involves our New Haven Federation of Teachers local.  Let me say that this matter involves what is not unusual election allegations, internal election allegations.  And <u>then there is a piece of this which makes this a very high priority case and different from many other internal elections</u>. . . .
> [Burns'] allegations are in the packet.  They're not particularly -- I mean, they're important.  They're very important.  Don't get me wrong. But they're the kind of allegations that many of you have seen before in elections.  They involve [ballot mixing, defamatory communications, etc.]. . . .  <u>But this is the important part of this investigation which does make it very different</u>.  About three weeks ago Mr. Burns had a meeting with the president, the first vice president, and the AFT Connecticut lawyer.  In that meeting Mr. Burns said to the president, 'I have information on your use of auto expenses that were reimbursed and on gift cards that went to members that I'm going to go to the public and to the authorities with unless you resign immediately.'  That would have then created a vacancy in the president's position.  The first vice president would have risen up.  A vacancy would have been created in the first vice president slot.  That would have been filled by Mr. Burns in this scheme.  Then the first vice president will resign and there will be an election for the president.  So there's the scheme.  But you can see what's going on here.  <u>This is an extortion attempt</u>.

[ECF No. 28-3 at 8-10 (emphasis added)].  Strom made clear that Burns' attempted extortion of Cicarella was a horse of a different color than his run-of-the-mill election protest.  Burns' election concerns would be addressed in due course; his extortion, which was unrelated to the December 2018 election, required immediate discipline because of Burns' perceived gross and wanton violations of the union democratic ethos.

The Court also takes note that in correspondence with both Burns and the Department of Labor in 2019 and 2020 before this case was filed, General Counsel Strom never argued that the punishment imposed on Burns was not "discipline" within the meaning of the LMRDA.  Rather, he argued that the punishment imposed was proper because the notice and other due process requirements of 29 U.S.C. § 411(a)(5), entitled "Safeguards Against Improper Disciplinary Action," were fully complied with.  *See* [ECF No. 23-11 (Strom November 22, 2019 Letter to Burns: Burns' arguments to date "ha[d] no merit" because, in part, "[y]ou were provided full notice of the issues that were going to be addressed at the hearing. . . . In sum, you were provided a detailed description of the issues that were going to be addressed at the hearing, ample time to prepare, the opportunity to present witnesses and evidence and to cross exam [sic] other witnesses, the right to counsel and an impartial set of decision makers.  As such, this process comfortably exceeds the applicable legal due process standards for these types of proceedings")].

Additionally, as noted, when the Department of Labor investigated Burns' second complaint regarding his disqualification from the February 2020 rerun

election, [ECF No. 23-1 at 9-10], the AFT and NHFT, on March 5, 2020, submitted a joint statement to the DOL, signed by General Counsel Strom, arguing that "[i]t is the position of the AFT and [NHFT] that the AFT provided Mr. Burns with 'written specific charges' that were more than sufficient to satisfy the requirements of the Act."  [ECF No. 28-7 at 14-22].  This was because the May 24, 2019 Notice of Hearing had, according to Strom, stated that the June 6, 2019 AFT Executive Council hearing would consider "whether the allegations concerning Mr. Burns' threats to Mr. Cicarella, where Mr. Burns stated he would go to the authorities and the media with allegations of financial impropriety unless Mr. Cicarella stated he would resign from office, are accurate and if they are what should the consequences be."  *Id.* at 15-16.  Thus, although "[t]he requisite degree of specificity required to meet the statutory standards will, of necessity, vary from case to case[, t]he circumstances surrounding an alleged disciplinary infraction by a union member, and the time and place as nearly as can be ascertained, constitute the minimal information that the union should disclose to the accused in order to afford him a reasonable opportunity to prepare his defense."  *Id.* at 17 (emphasis added) (quoting *Gleason*, 300 F. Supp. at 1251).  In sum, Burns' "allegedly extortionate statements were the reason for the disciplinary action."  *Id.* at 20 (emphasis added).

It is clear to the Court from Strom's communications with both Burns and the DOL that he considered, when it occurred, what the AFT had done to be "discipline" within the meaning of the LMRDA.  And Strom should know, as AFT's General Counsel.  NHFT's counsel's attempt in litigation to provide a substitute reason for its actions, i.e. that Burns was not disciplined and that therefore no

notice was required, smacks of "impermissible '*post hoc* rationalization.'"  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1896 (2020).

Finally, the Court notes that the consequences of the "disciplinary action" taken to deal with Burns' extortion attempt indicate that discipline, as opposed to some remedial action, occurred.  Burns was not allowed to run in the rerun election held in February 2020 and will not be allowed to run *in the election after that* and *cannot hold any union office during that entire span of time*.  The Court agrees with Plaintiff that NHFT's "decision to extend its order beyond any rerun of the 2018 election makes clear that this was not an attempt to remedy election misconduct – this was union disciplinary action, plain and simple."  [ECF No. 41 at 8].  The Second Circuit has consistently held that barring a union member from running for union office constitutes "discipline" because it affects his rights as a union member.  *Schonfeld*, 477 F.2d at 904 ("rendering a man ineligible from seeking union office . . . affects him as a member and permits him under the Act to challenge the fairness of the procedures resulting in such political exile"); *Newman*, 570 F.2d at 448 (plaintiff retained "all of the rights of union membership, including . . . candidacy for union office"); *Riordan v. AFGE*, No. 01 Civ. 1136 (SAS), 2001 U.S. Dist. LEXIS 17874, at *11 (S.D.N.Y. Nov. 1, 2001) ("Although not explicitly mentioned in section 411, the Second Circuit has held that candidacy for union office is a membership right under Title I of the LMRDA," prevention of which constitutes discipline under the LMRDA).  Even *Teamsters* recognized this principle: "Section 101(a)(5)'s procedural protections apply only to disciplinary actions that affect 'membership rights' [but] we have stated that 'rendering a man ineligible from

seeking union office . . . affects him as a member and permits him under the Act to challenge the fairness of the procedures resulting in such political exile.'"  156 F.3d at 361 (quoting *Schonfeld*, 477 F.2d at 904).  *Teamsters*, however, carved out a narrow exception to this principle for "remedial" action taken solely to correct union member wrongdoing in a previous election and barring the member only from the rerun election.  This is not that case.

In sum, the Court holds that Defendant disciplined Burns within the meaning of the LMRDA.  NHFT's motion for summary judgment on this issue is denied,[3] and Plaintiff's motion for summary judgment on this issue is granted.[4]

**B.    NHFT Failed to Provide Burns with the Proper Safeguards Against Improper Disciplinary Action Required by 29 U.S.C. § 411(a)(5)**

As mentioned, 29 U.S.C. § 411(a)(5), Safeguards Against Improper Disciplinary Action, mandates that:

> No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

---

[3] Rule 12(d) states that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  The Court thus converts NHFT's Motion to Dismiss to a Motion for Summary Judgment and denies it in parallel with NHFT's separate motion for summary judgment on this issue.

[4] Plaintiff asks the court to convert its Motion for Partial Summary Judgment, filed before the close of discovery, to a full Motion for Summary Judgment, as the Parties have taken all required discovery.  The Court so converts Plaintiff's Motion.

29 U.S.C. § 411(a)(5). Plaintiff argues that Thomas Burns was improperly disciplined because he was not "served with written specific charges" of the offense he committed as required by Subsection A. The Court agrees.

The problem with the documentation Burns was provided is that it did not indicate that he would be attending a disciplinary hearing *at all*. The May 24, 2019 Notice of Hearing AFT sent to Burns stated in the first paragraph that "Article VI, § 14(b) of the AFT Constitution authorizes the AFT to investigate an internal election in one of our affiliates where there has been an allegation that either the local, state or national constitution has not been followed or there has been a breach of law." [ECF No. 18-2 at 2].

Next, the May 24 Notice of Hearing stated that there would be three issues "relating to the challenge to the local [December 4, 2018] election" covered at the June 6, 2019 hearing: (1) "The merits of the original challenge to the election by Mr. Burns that was filed with the AFT on March 3, 2019 [sic: March 22, 2019]", (2) "The merits of the response from the NHFT that was filed with the AFT on May 6, 2019," and (3) "The circumstances that led to the attached letter to Mr. Burns from Attorney William Dow." [ECF No. 18-2 at 2-3]. Immediately after that summary, the May 24, 2019 Notice of Hearing had a "Ground Rules" section:

> This is a fact-finding and <u>not</u> an adversarial proceeding. The purpose of the hearing is to present evidence and testimony to the AFT Committee so that it can prepare a report and recommendations to the full AFT Executive Council. The questions to the witnesses will primarily come from the Committee. There will be limited crossexamination. While the parties are free to have legal counsel at the hearing, the role of such counsel will be limited.

[ECF No. 18-2 at 3 (emphasis in original)].

Finally, the May 24 Notice of Hearing attached the "Dow Letter," which Cicarella's attorney William Dow had sent to Burns on May 8, 2019.  [ECF No. 18-2 at 35-36].  That letter stated:

> You have made accusations against Mr. Cicarella in the presence of others and have threatened to report those accusations to law enforcement authorities and / or to publicize those accusations which would harm his reputation and subject him to ridicule unless he agrees to relinquish his position as President of the Federation. Conversely, should he resign, you will not report those accusations to law enforcement or to the media.  Your actions constitute extortion, a criminal act, under the laws of the State of Connecticut.

*Id.*

The Court finds that these documents fail to meet the written specific charges requirement prior to discipline being imposed of 29 U.S.C. § 411(a)(5)(A) for several reasons.

First, the Court has no issue with the idea that written specific charges served prior to union discipline need not entail the specificity of a criminal indictment handed down before arrest, but the issue here is that the May 24, 2019 Notice of Hearing not only was unspecific, it also affirmatively misled Mr. Burns as to the content and nature of the June 6, 2019 hearing.  The Notice indicated that the June 6 hearing would be conducted pursuant to "Article VI, § 14(b) of the AFT Constitution [which] authorizes the AFT to investigate an internal election in one of our affiliates where there has been an allegation that either the local, state or national constitution has not been followed or there has been a breach of law." [ECF No. 18-2 at 2].  So, the June 6, 2019 hearing was described as pertaining only to potential impropriety with the December 4, 2018 election.  The first two topics to be discussed, according to the May 24 Notice, were Burns' December 2018 election

protest, which was obviously appropriate as it directly concerned improprieties with the December 2018 election, and NHFT's response, which presumably would address why NHFT found Burns' protest meritless, and was also appropriate as directly addressing the December 2018 election.  But then the May 24 Notice explained that the circumstances leading to the Dow Letter would also be discussed, yet review of that letter makes it plain that the extortion complained of had to do with Burns' financial practices complaint against Cicarella, complaints about long-standing alleged wrongdoing by Cicarella, e.g. accepting a $400/month car payment from the union although his car had been paid off, not the December 4, 2018 election.  And neither the Dow Letter nor the May 24 Notice itself in any way addressed the idea of Burns eventually becoming President after Cicarella stepped down, DeLucia stepped up, etc.  In other words, the Notice nowhere discussed the idea of Burns circumventing through extortion what he could not do in the election – it only discussed his going to the authorities and the media if Cicarella did not step down.

Even worse, the May 24 Notice stated in the Ground Rules section that the June 6 hearing would be "a fact-finding and not an adversarial proceeding."  [ECF No. 18-2 at 2 (emphasis in original)].  And that section did not state that disciplinary punishment would be meted out as a result of the June 6 hearing, but rather only that "[t]he purpose of the hearing is to present evidence and testimony to the AFT Committee so that it can prepare a report and recommendations to the full AFT Executive Council."  *Id.*  The Notice is not clear what would happen then, which is another issue, but the real problem is that that is NOT what happened; rather, the

AFT relatively quickly disciplined Burns, banning him from the February 2020 rerun election, the follow-on election, and from holding union office of any kind during that entire time span.

Strom's correspondence with the Department of Labor, in which he claimed that the May 24, 2019 Notice of Hearing informed Burns that "the June 6, 2019 AFT Executive Council hearing would consider 'whether the allegations concerning Mr. Burns' threats to Mr. Cicarella, where Mr. Burns stated he would go the authorities and the media with allegations of financial impropriety unless Mr. Cicarella stated he would resign from office, are accurate and if they are <u>what should the consequences be</u>,'" [ECF No. 28-7 at 15-16 (emphasis added)], was grossly inaccurate.  The Notice did not inform Burns that this would be a full-blown union disciplinary hearing that could very well result in significant punishment including being barred from running for office in two subsequent elections and from holding office during that time.

It is thus understandable why Burns was so confused about why the "extortion" issue was going to be discussed at the June 6 hearing, as he made clear: "and the Willie Dow thing?? whats [sic] that?? [] a joke??"  Pl.'s Stmt. ¶ 16; Def.'s Stmt. ¶ 16; [ECF No. 23-15 ("Burns witness list email")]; "No, the Willy Dow letter. We're not going to do that? I hope we're not doing it because it wasn't [] my [election] complaint."  Pl.'s Stmt. ¶ 20; Def.'s Stmt. ¶ 20; Transcript of June 6, 2019 Investigative Hearing, [ECF No. 23-7].  These statements make clear that Burns expected, based on the May 24 Notice, that the June 6 hearing would concern the

December 2018 election and his protest thereto, not alleged wrongdoing on his part separate from the election.

When Burns called AFT General Counsel Strom before the June 6 hearing in an attempt to straighten out what would happen at the June 6 hearing, Strom made the situation worse.  On May 30, 2019, Burns and Strom spoke on the telephone. Burns Depo. Tr. at 139:16-141:17.  When Burns told Strom he did not understand why the alleged extortion issue would be discussed at the June 6, 2019 hearing, because it "doesn't have anything to do with [Burns' election] complaint," Strom responded that the hearing would be "not adversarial" and "just a fact finding, friendly thing."  *Id.* at 141:10-17.  This testimony by Burns is not disputed in the record despite Strom filing two declarations in support of NHFT's filings.

At no point prior to the June 6, 2019 hearing did Strom, AFT, or Defendant explain that the June 6, 2019 hearing could result in Burns' disqualification from running for office or any other union discipline.  Pl.'s Stmt. ¶ 19; Def.'s Stmt. ¶ 19; Burns Decl. ¶ 10.  And it is a mystery to the Court why that is so and why the June 6 hearing was inappropriately characterized as a "fact-finding," not adversarial, and just a "friendly thing."

NHFT attempts to minimize Burns' concerns as mere "procedural objections" to the June 6 hearing, but that is the whole point.  Burns "did nothing" to prepare for the hearing because the AFT and Strom indicated that he did not need to, apparently on purpose to gut any response Burns might have put forward. This is an inference the Court can reasonably draw from Mr. Strom's statement to the AFT Executive Council in which he flatly averred "This is an extortion attempt."

43

Strom was on the warpath, as was the entire AFT Executive Council after that point, and they did not provide Mr. Burns with an affirmative statement that the June 6 hearing would be disciplinary in nature; rather, they indicated just the opposite. This does not meet the written specific charges requirement of 29 U.S.C. § 411(a)(5)(A), which was enacted as one of the "Safeguards Against Improper Disciplinary Action."  The Court agrees with Plaintiff that "[s]imply put, Burns had no indication that the June 6, 2019 hearing would be his opportunity to defend himself against a charge of misconduct to avoid discipline."  [ECF No. 41 at 10].

In sum, Burns was disciplined and not provided with adequate written specific charges before that occurred, in violation of the LMRDA.

C.     NHFT's Improper Discipline May Have Affected the Outcome of the February 2020 Rerun Election

The LMRDA requires that the district court declare a contested election void and order a new election under the Government's supervision where a violation of section 401 "may have affected the outcome of the election."  29 U.S.C. § 482(c)(2). Once Plaintiff establishes a violation of section 401, he has established a *prima facie* case that the violation may have affected the outcome of the election, and the burden of proof shifts to the union to produce tangible evidence that the results of the election would have been the same absent the violation.  *Hotel, Motel & Club Emps. Union, Local 6*, 391 U.S. at 506-08.  As Plaintiff argues, this presumption is quite strong:

> [O]nce a Section 481 violation has been demonstrated, a very substantial burden falls upon a defendant union.  It must show by a preponderance of the evidence that the particular violation did not affect the outcome of the election.  Until it does so, the presumption remains that such violation might have had an effect on the results,

and this presumption of mere possible influence suffices to warrant a new supervised election.

*Usery*, 422 F. Supp. at 1226.  The Court discerns no evidence that NHFT has put forth that had Burns been on the ballot in the February 2020 rerun election the results would have been the same.  On the contrary, since he came within 20 votes of unseating Cicarella in the original December 2018 election, he may well have prevailed in the rerun.  NHFT argues that there was no violation because Burns was not prejudiced, but as explained, Burns was prejudiced by the May 24 Notice and Strom's conduct, which was apparently designed to prevent him from taking meaningful action to defend himself.  Thus, the Court finds that Defendant's violation of LMRDA may have affected the outcome of the February 2020 rerun election.

In sum, the Court agrees with Plaintiff that "[t]he only way to remedy this violation is to conduct a new election, including new nominations, under the supervision of the Department."  [ECF No. 23 at 20].

V. Conclusion

For the foregoing reasons, the Court GRANTS Plaintiff's Motion for Summary Judgment and DENIES Defendant's Motions to Dismiss and for Summary Judgment.  The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 18, 2021